Filed 2/24/22  P. v. Sison CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D078552 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE239548) |
| JEFFERSON SISON, | |
| Defendant and Appellant. | |

PPEAL from an order of the Superior Court of San Diego County, Roderick Ward Shelton, Judge.  Reversed and remanded with directions.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Heather M. Clark, Deputy Attorneys General, for Plaintiff and Respondent.

Jefferson Sison appeals an order summarily denying his petition to vacate his first degree murder conviction under Penal Code[1] section 1170.95. The trial court found he was not entitled to relief, as a matter of law, because the jury returned a true finding on a robbery-murder special circumstance with the murder conviction. The jury's finding on the special circumstance was made before the California Supreme Court's decisions in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), which clarified the meaning of the terms "major participant" and "reckless indifference to human life" necessary to support such felony-murder special-circumstance findings. (*Banks*, at pp. 797–798, 803; *Clark*, at pp. 608–624.)

Our high court is currently reviewing the question of whether a felony-murder special-circumstance finding made before *Banks* and *Clark* precludes a defendant from making a prima facie showing of eligibility for relief under section 1170.95. (*People v. Strong* (Dec. 18, 2020, C091162) [nonpub. opn.], review granted Mar. 10, 2021, S266606.) Until then, we follow this court's opinions in *People v. Wilson* (2021) 69 Cal.App.5th 665 (*Wilson*) (Irion, J., O'Rourke, A.P.J., Guerrero, J.) and *People v. Arias* (2021) 66 Cal.App.5th 987 (*Arias*) (McConnell, P.J., Dato, J., Guerrero, J.), and conclude a felony-murder special-circumstance finding made before *Banks* and *Clark* does not categorically bar relief under section 1170.95.[2] Further, given the limited record of conviction before us, we are unable to independently determine

---

[1]     Statutory references are to the Penal Code unless otherwise specified.

[2]     We acknowledge a panel of this court has reached the opposite conclusion. (*People v. Gomez* (2020) 52 Cal.App.5th 1, 17 (*Gomez*) (O'Rourke, J., Benke, A.P.J., Huffman, J.), review granted Oct. 14, 2020, S264033.)

whether the special circumstance finding satisfied the standards set forth in *Banks* and *Clark*. We therefore reverse the trial court's order denying the petition and remand the matter for resumption of proceedings.

FACTUAL AND PROCEDURAL BACKGROUND[3]

"A. *Prosecution Evidence*

"*The [S.A.] Carjacking (Count 1)*

"On December 28, 2003, at 10:45 p.m., [S.A.] was driving a black Honda Civic, equipped with aftermarket items, including a premium stereo system, 17-inch chrome rims and low profile tires, when he stopped at an automated teller machine in the parking lot of a shopping center in Spring Valley. [S.A.'s] fiancée, [T.T.], was a passenger in the vehicle. When [S.A.] realized he had not signed the check he planned to deposit, he returned to his car and sat in the driver's seat to sign the check. The driver's side door was open. [T.T.] stood outside the car next to him.

"Suddenly two men ran up to [S.A.] and [T.T.], who began screaming. One man held a gun in [S.A.'s] face and told him to hand over his wallet; [S.A.] complied. The man ordered [S.A.] to get up, but when [S.A.] began to stand up, the man hit him with the gun and pushed him back into the car. The other man opened the passenger door and ordered [S.A.] to pop open the trunk with the trunk release, give the car keys to the first man and get out of the car. [S.A.] did what he was told to do. The second man then grabbed [T.T.'s] hair, held a gun to her head, pulled her to the back of the car and ordered her to get in the trunk.

---

[3]　We take the following summary of the facts from this court's opinion affirming the judgment against Sison in *People v. Martin et al.* (Nov. 13, 2007, D047341 [nonpub. opn.] (*Martin*). In some instances, we use initials in place of full names to protect the privacy of third parties.

3

"[V.V.], who had just left the grocery store in the shopping center, noticed a commotion in the parking lot and drove toward it. When he saw a woman on the ground, [V.V.] started honking the horn and flashing the headlights on the people near [S.A.'s] Honda. Upon hearing the horn, the man who was holding [T.T.] released her and said, 'Let's get out of here,' and entered the Honda on the passenger side. The first man drove away. [V.V.] telephoned 911 and drove [S.A.] and [T.T.] to a sheriff substation nearby.

"[S.A.] said the man who first approached him was more husky than the other man. [S.A.] described the assailants as two Asian men who were approximately five feet, eight inches to five feet, ten inches tall and weighed between 200 and 225 pounds. [T.T.] thought the men were either Filipino or Mexican. Both men wore hooded sweatshirts and masks. One of the men wore camouflage-type pants.

"The following day, Martin, who worked as a security guard at the Sycuan casino told two of his coworkers, [C.K.] and [J.D.], about a recent Spring Valley carjacking in which he and his partner held two unknown individuals at gunpoint and took their vehicle. Martin described how he loved the carjacking and described it from 'start to finish,' according to [J.D.] Martin drew a street map of the shopping center. Sison glanced at the map and nodded his head. Martin said: ' " 'Oh, hey, I was talking about what we did the other night, this kind of stuff. You know what I mean?' " ' Sison responded, ' " 'Oh, yep, yep.' " ' According to [J.D.], Sison did not seem surprised and displayed a 'ha, ha, ha, hee, hee, hee, yep, that kind of attitude.'

"On December 30, sheriff deputies recovered [S.A.'s] car from a residential area in Spring Valley. The car no longer had the premium stereo

4

system, wheels or rims.  The axle was bent, and the car could not be driven properly.

"In May 2004, [S.A.] and [T.T.] were shown photographic lineups. [S.A.] did not recognize any one on the first photo page and when he was asked to look again, he pointed to a picture of Martin and said he looked familiar and could have been one of the men involved.  [S.A.] could not identify Sison.  [T.T.] was unable to identify either Martin or Sison from the photographic lineups.  At trial in 2005, [S.A.] could not identify either Martin or Sison.

*"The [B.K.] Attempted Carjacking and Attempted Murder (Counts 2 & 3)*

"On the evening of March 4, 2004, Martin arranged a meeting on Sweetwater Lane with [B.K.], from whom he was purchasing anabolic steroids.  At about 9:15 p.m., [B.K.] was sitting in his vehicle parked on the street with the motor running when he saw two men approaching from the rear.  One man, whom [B.K.] later identified as Martin, walked up to the passenger side of the vehicle and knocked on the window.  [B.K.] motioned for the man to get into the vehicle.  The man stepped back, pulled a bandana over his face, opened the truck, stuck a gun in [B.K.'s] face and ordered [B.K.] to get out of the car.  At the same time, the other man, whom [B.K.] later identified as Sison, opened the driver's side door and pistol whipped [B.K.]. [B.K.] released the emergency brake and floored the gas pedal.  As the vehicle began to move, Martin, who was partially in the vehicle, fired a shot at [B.K.].  The bullet hit the post behind [B.K.'s] head, but shrapnel struck [B.K.] in the shoulder.  Then Sison fired a shot at [B.K.], but missed.  [B.K.] quickly drove away.

"[B.K.] had never met Martin before.  All of their discussions leading to the unconsummated sale had been on the telephone.  Martin had been

5

referred to [B.K.] by his coworker [J.D.]. After the attempted carjacking, [B.K.] left [J.D.] a voice mail message asking [J.D.] to not tell Martin anything about him. That night [B.K.] did not contact law enforcement because he believed authorities would not do anything and because he did not want to get in trouble for selling steroids. The following day, [B.K.] changed his mind and contacted authorities.

"In late March, Sheriff Detective Douglas Akers received information from Sycuan Gaming about a carjacking that had occurred on December 28, 2003. Sycuan security put Akers in contact with [C.K.] and [J.D.]. [C.K.] gave Akers a pocket-sized digital recorder with a recording of portions of the December 29 conversation between him, [J.D.] and Martin. During his interviews with [C.K.] and [J.D.], Akers also learned about the attempted carjacking and shooting of [B.K.].[4]

"On March 24, Akers interviewed [B.K.], examined the vehicle [B.K.] had been driving on March 4 and showed [B.K.] two photographic lineups. [B.K.] identified Sison in one of the photographic lineups. In the other, [B.K.] initially said the photograph of Martin looked like the other man, but was thinner. Ultimately, [B.K.] selected the photograph of another man in the lineup as the second assailant.[5]

"On April 20, sheriff deputies arrested Martin and Sison. After advising Martin of his *Miranda* (*Miranda v. Arizona* (1966) 384 U.S. 436) rights, Akers told him that he was a suspect in the [S.A.] carjacking. At first,

---

[4]    "Akers was unable to find a crime report of the attempted carjacking and shooting of [B.K.], but [he] spoke to a sheriff deputy who had talked with [B.K.] after she received a radio call to contact the reporting party of an attempted carjacking."

[5]    "[B.K.] identified Martin and Sison at the preliminary hearing and at trial."

6

Martin denied any participation. Martin also denied knowing [B.K.]. After Akers showed Martin cellular phone records showing he and [B.K.] had numerous calls with each other, Martin said he was trying to buy steroids from [B.K.]. After Akers played the recording of the conversation Martin had with [C.K.] and [J.D.] the previous December, Martin admitted he had carjacked [S.A.'s] vehicle.

"After receiving his *Miranda* rights advisement, Sison denied knowing [B.K.]. Akers then confronted Sison with a piece of paper from his car that had [B.K.'s] name and cellular phone number on it, and Sison admitted he knew [B.K.]. When Akers played the recording of Martin telling [C.K.] and [J.D.] about the [S.A.] carjacking, Sison denied participating in the crime and said that Martin was not referring to him in the recording.

*"The [F.L.] Murder (Count 4)*

"On April 8, [F.L.] and his girlfriend went out to dinner to celebrate his birthday. [F.L.] owned a black Lexus with 20-inch Diablo wheel rims, a dashboard television that flipped up, a television on the passenger's visor and a television on the driver's visor. [F.L.] dropped his girlfriend off at her home around 9:30 p.m. and said he was meeting someone. [F.L.] had told his cousin that he was going to look at a gun he wanted to buy.

"On April 9, a bicyclist on International Road in South San Diego saw shell casings, blood and drag marks on the road.[6] The bicyclist followed the drag marks to a brush area and discovered a dead body underneath a piece of carpet. The body was on its back with the arms extended, indicating it had been dragged. The arrangement of the clothing on the body also indicated

---

[6]  "It was later determined from the casings that the handgun that was used was .380 caliber."

the body had been dragged. From a thumbprint on the body, San Diego police identified the victim as [F.L.].

"The autopsy revealed the cause of death was multiple gunshot wounds. The first wound was a perforating gunshot wound to the back of [F.L.'s] head. The wound was a contact range wound; it was inflicted with the end of the gun barrel against the skin. This wound was fatal; the bullet separated the brain from the brain stem. The second wound was a perforating gunshot wound on the right side of [F.L.'s] head and would have been fatal as well. There were six other gunshot wounds in his left arm, upper chest area, lower chest and upper abdomen area, right buttock, right leg, and left forearm.

"Police received their first solid lead from [J.M.], who was a friend of [F.L.] and Martin. [J.M.] revealed that a couple days before [F.L.] was killed, Martin had asked him about [F.L.]. Martin wanted to know if [F.L.] carried a gun and who might back up [F.L.] if he got into trouble or ran into gang members. [J.M.] said he had not thought much about Martin's questions at the time, but after [F.L.] was murdered he immediately connected the conversation to [F.L.'s] murder. [J.M.] also said that a few days after [F.L.'s] murder, Martin visited him and asked if he wanted to buy rims. The rims were the same ones as those on [F.L.]'s Lexus.

"After interviewing [J.M.], homicide detective Jonathan Smith conducted a background check on Martin and learned that Martin had been employed at Sycuan casino and was in custody for a carjacking and shooting in Spring Valley.

"On May 7, Smith and another detective interviewed [T.D.], a slot machine attendant at Sycuan Casino who had become Martin's friend while they worked at the casino. Initially, [T.D.] denied knowing anything about a

8

black Lexus and someone named [F.L.]. When confronted with records showing numerous calls made between his phone and Martin's cellular phone on April 8, [T.D.] said he was asleep at home that night and did not know why Martin called him so many times. After the detectives told [T.D.] they did not believe him and emphasized the seriousness of the crime they were investigating, [T.D.] said he had had a conversation with Martin and had taken Martin to the location where the Lexus was found. [T.D.] showed the detectives where the Lexus was found.

"[T.D.] agreed to go to police headquarters and repeated the story he had told the detectives. However, [T.D.] added that there was another person with Martin, whom he thought was named 'Jeff.' [T.D.] said 'Jeff' arrived in the black Lexus, which had shiny rims. 'Jeff' went to a liquor store and obtained a crate to put under the Lexus after the tires were removed. [T.D.] said Martin became frustrated with him because he did not how to 'jack up' a car; Martin pushed [T.D.] out of the way to do it himself. The rims were placed in the back of Martin's car. [T.D.] said he had spoken with Sison but did not know him.

"On June 9, Smith and another detective reinterviewed [J.D.]. Initially [J.D.] denied going to Martin's residence on the night [F.L.] was killed and said he was not holding anything back. But later, after seeing cellular phone data, [J.D.] started crying and asked, ' " 'What if I witnessed something?' " ' [J.D.] confirmed he was there when [F.L.] was killed, but said he did not know that it was going to happen. [J.D.] also said he had heard Martin describe the gun as a .380 caliber gun. Subsequently, [J.D.] showed the detectives where [F.L.] was killed, where his truck and [F.L.'s] Lexus were parked, how he and the others walked down to the field, where each person was standing and where the firing began.

9

"In October, [J.D.] was informed he would not be prosecuted for stripping [F.L.'s] car or disposing of the stolen property from the vehicle. [J.D.] testified at trial that he did not expect to be prosecuted.

"At trial, [J.D.] was the prosecution's chief witness and testified as follows: [J.D.] telephoned Martin on the afternoon of April 8 to inquire about stereo equipment, which Martin was selling. During the conversation, Martin asked if [J.D.] knew anyone who wanted to buy a gun. Throughout the day, Martin and [J.D.] talked several more times, and Martin invited [J.D.] to come to his house around 11 p.m. Martin also instructed [J.D.] to say, ' " 'I forgot it,' " ' when he arrived. [J.D.] drove his Ford Ranger to Martin's residence, where Martin, Sison and [F.L.] were standing outside. Martin asked, ' " 'Did you bring it?' " ' [J.D.] had forgotten Martin's earlier instruction and responded, ' " 'Bring what?' " '

"Martin introduced [J.D.] to [F.L.] and they discussed [F.L.] purchasing a gun from Martin. When [F.L.] went to his car to get something, Sison pulled a gun from his waist band and handed it to Martin, who tucked the gun in his waistband. Sison said, ' " 'Here, you do it.' " ' When [F.L.] came back to the group, he wanted to make sure the gun worked properly, and they decided to go somewhere to test fire the gun. Sison rode with [J.D.] in his Ford Ranger truck, and Martin and [F.L.] left in [F.L.'s] Lexus, with Martin driving.

"[J.D.] and Martin drove south on Highway 54, exited shortly before reaching the border and parked at the end of a dead-end street in a residential neighborhood. The foursome walked down stairs that led to an unpaved road along a river bed. After about 20 yards, Martin left the group and walked up an embankment. Then Sison walked into some bushes. Martin suddenly turned around, mumbled something and fired a gun at

10

[F.L.]. As [F.L.] turned around to run, Martin shot him in the back. [F.L.] began running and was begging Martin to stop. Martin chased [F.L.] while continuing to fire shots.[7] Sison came out of the bushes and also started chasing [F.L.]. After the shooting stopped, it appeared that Martin and Sison were tugging at [F.L.'s] leg. Martin jogged back to where [J.D.] was standing, and, within a moment, Sison followed, but he was limping. Martin, Sison and [J.D.] returned to the vehicles. Martin drove with [J.D.] and told Sison to drive the Lexus. The Lexus was driven to 'The Spot,' a street in a residential area of Spring Valley where cars are frequently stripped. They decided not to strip the car at that time, and Martin told [J.D.] to go home.

"Between 1:30 a.m. and 2:00 a.m. on April 9, Martin telephoned [S.M.], a coworker at Sycuan casino, and asked if [S.M.] had a garage where he could store a Lexus. [S.M.] heard a voice in the background, which he thought was Sison's voice, but was not sure. [S.M.] told Martin he did not know of any place to store the Lexus.

"Later in the morning, [J.D.] met with Martin and Sison and went to an apartment complex in El Cajon, where Sison parked the Lexus in an alley. [J.D.] watched as Martin and Sison, both of whom were wearing gloves, stripped down the Lexus. Martin and Sison removed the rims and put them in the back of [J.D.'s] truck. Other items from the Lexus were put in Martin's vehicle. The stripped Lexus was left in the alley.

"Sometime in April, Martin tried to sell 20-inch Diablo chrome rims to some of his coworkers in the employee parking lot of the casino. Martin said the rims were from a Lexus.

---

[7] "[P.F.], who lived about four houses from the field, testified she was awakened between 12:20 a.m. and 12:50 a.m. by seven or eight gunshots."

11

"The prosecution also presented Martin's cellular phone records, where indicated he drove from Spring Valley to South San Diego on two separate occasions between the late night hours of April 8 and the early morning hours of April 9. The records also showed, among other things, a large number of calls between Martin and Sison, and Martin and [J.D.] during those hours.

"B. Defense Evidence

"Martin's Defense

"Martin admitted he carjacked [S.A.'s] car on December 28, 2003. Although he and Sison initially believed the car was unattended and only intended to steal the car, they decided to take the car in any event after they saw [S.A.].

"Martin also admitted that he had made plans to buy steroids from [B.K.] on March 4, 2004, but said he sent Sison and [J.D.] to meet [B.K.] and make the purchase. Martin said he did so because his girlfriend was expecting him that night. Martin testified he spent the evening with his girlfriend and did not see Sison or [J.D.] until the next day. Martin asked Sison, whom he had given $200 for the steroid purchase, if he had the steroids. According to Martin, Sison told him that he and [J.D.] had tried to 'jack' the car, but they had 'fucked' up. Martin's girlfriend testified that he had spent the evening with her; she was sure of that because of an entry in her journal.

"Martin denied he had anything to do with [F.L.'s] murder on April 8. Martin testified as follows: [F.L.] wanted to buy a gun, and Martin knew [J.D.] had a gun for sale. Martin arranged to be the 'middle man' in the gun sale with all three meeting at Martin's residence that evening. [F.L.] and [J.D.] arrived shortly before 9:30 p.m.; Sison, who had brought some stolen radios for Martin to sell, was already there. [J.D.] pulled out his gun; [F.L.]

12

wanted to test fire it because something was wrong with the clip. After suggesting [F.L.] go someplace else to test the gun, Martin left to try to sell the radios. Martin assumed Sison left as well. Martin was informed by telephone calls that [J.D.] and [F.L.] could not find a location to test fire the gun and suggested that [J.D.] 'hook up' with Sison. Sison later telephoned Martin and suggested he meet them at a baseball field near the border, but Martin could not find the location. Martin decided to go home and telephoned [J.D.] at 12:44 a.m. to find out whether [J.D.] had sold the gun to [F.L.]. After telling Martin that [F.L.] did not buy the gun, [J.D.] asked Martin's help in finding a garage to house a car he had just carjacked. Martin met [J.D.] and Sison in a Spring Valley shopping center, and then the three of them left the Lexus at 'the Spot' for the rest of the night. The next day, Martin, Sison and [J.D.] stripped the Lexus in an alley near [J.D.'s] residence. Martin did not know the Lexus was [F.L.'s] car until a couple of days later, when [J.M.] told him that [F.L.] had been shot.

"Martin also presented several character witnesses who testified that they did not believe Martin was a violent person.

"*Sison's Defense*

"Sison denied participating in the [S.A.] carjacking on December 28, 2003. Sison testified that on that evening, long-time friends had visited him and brought a gift for Sison's daughter. Sison said Martin lied when he testified he talked to Sison about stripping [S.A.]'s car the day after carjacking. Sison said Martin bragged about carjackings all the time. Sison said if he had heard Martin saying anything about his involvement in the crimes he would have responded by saying 'bullshit' and '[h]e's a liar.' According to Sison, at the beginning of 2004, he and [J.D.] were competing for a promotion and had a confrontation that almost escalated into a fight.

13

"Sison denied he had anything to do with the attempted carjacking of [B.K.] on March 4, 2004. Sison said Martin had given him [B.K.]'s telephone number because he was interested in working out and Martin had suggested he use steroids. Sison said he was with his girlfriend in their apartment on the evening of March 4.

"Sison denied having anything to do with [F.L.] or [F.L.]'s car. Sison testified that he spent the evening of April 8 with his girlfriend in their apartment and they watched wrestling on television. When the wrestling program ended, Sison went outside to smoke a cigarette with his neighbor, [S.W.]. [S.W.] testified that she saw Sison on his porch smoking a cigarette between 10:00 p.m. and 10:30 p.m. on April 8.

"Sison also presented witnesses who testified that Sison was a trustworthy person and it would have been out of character for him to have committed the charged offenses."

The jury convicted Sison of the first degree murder of [F.L.] (§ 187, subd. (a); count 4). It further found a principal was armed with a firearm in the commission of the murder (§ 12022, subd. (a)(1)) and made a true finding on the special circumstance allegation that the murder was perpetrated in the commission or attempted commission of a robbery (§ 190.2, subd. (a)(17)).[8]

The court sentenced Sison to prison for life without the possibility of parole for first degree murder. In addition, the court sentenced Sison to a determinate term of 28 years six months: one year eight months for

---

[8] The jury also convicted Sison of (1) carjacking (§ 215, subd. (a); count 1) with a true finding that Sison personally used a firearm in the commission of count 1 (§ 12022.53, subd. (b)); and (2) attempted carjacking (§§ 664, subd. (a), 215, subd. (a); count 2) with a true finding that Sison personally used and intentionally and personally discharged a firearm in the commission of count 2 (§§ 12022.5, subd. (a), 12022.53, subd. (c)).

14

carjacking; three years four months for personally using a firearm during the carjacking; two years six months for attempted carjacking; 20 years for intentionally and personally discharging a firearm during the attempted carjacking; and one year for having been vicariously armed during the murder.

In 2007, we affirmed Sison's conviction for first degree murder and attempted carjacking. However, we reversed his conviction for carjacking. (See *Martin*, *supra*, D047341.) Sison's sentence therefore was reduced to life without the possibility of parole plus a consecutive determinate sentence of 23 years six months.

On July 6, 2020, Sison filed a petition to vacate his sentence under section 1170.95. The petition alleged that a charging instrument was filed against Sison allowing the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine, he was convicted of first or second degree murder pursuant to the felony murder rule or the natural and probable consequences doctrine, and he could not now be convicted of first or second degree murder because of changes made to sections 188 and 189, effective January 1, 2019. Sison also requested the appointment of counsel.

On July 16, 2020, the People filed an initial response to the petition. On July 17, 2020, the court appointed counsel for Sison. On September 4, 2020, the People filed a supplemental response to Sison's petition. On December 30, 2020, Sison filed a reply.

On January 8, 2021, the trial court denied Sison's petition. The court explained that it had reviewed the case file, petition, and pleadings filed by both parties and determined that Sison had not made a prima facie showing that he was entitled to relief. Based on the holding in *Gomez*, *supra*, 52

15

Cal.App.5th 1, the trial court found that because the jury made a true finding on the robbery special circumstance against Sison, he was ineligible for relief under section 1170.95 as a matter of law.

DISCUSSION

I

*IMPACT OF FELONY-MURDER SPECIAL CIRCUMSTANCE FINDING MADE BEFORE* BANKS *AND* CLARK

"Effective January 1, 2019, the Legislature passed Senate Bill 1437 'to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).) In addition to substantively amending sections 188 and 189 of the Penal Code, Senate Bill 1437 added section 1170.95, which provides a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*).)

"Pursuant to section 1170.95, an offender must file a petition in the sentencing court averring that: '(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[;] [¶] [and] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made

16

effective January 1, 2019.' " (*Lewis, supra*, 11 Cal.5th at pp. 959–960; see § 1170.95, subds. (a), (b)(1).)

If the petition meets these basic requirements, the trial court "proceeds to subdivision (c) to assess whether the petitioner has made 'a prima facie showing' for relief. (§ 1170.95, subd. (c).)" (*Lewis, supra*, 11 Cal.5th at p. 960.) "If the trial court determines that a prima facie showing for relief has been made, the trial court issues an order to show cause, and then must hold a hearing 'to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not . . . previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence.' (§ 1170.95, subd. (d)(1).)" (*Ibid.*) At the hearing on the order to show cause, " '[t]he prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens.' (§ 1170.95, subd. (d)(3).)" (*Ibid.*)

The trial court determined Sison was not eligible for relief under section 1170.95 at the prima facie stage and, with respect to count 4, based its decision solely on the jury's robbery-murder special circumstance finding. Sison asserts the trial court erred because the special circumstance finding does not categorically bar him from relief under section 1170.95.[9] We agree.

There is no dispute here that Sison was not the actual shooter. The jury made felony-murder special circumstance findings pursuant to section 190.2, subdivision (a)(17), and those findings required the jury to conclude Sison either had the intent to kill or was a major participant that acted with reckless indifference to human life. However, the jury made those

---

[9]    We note the trial court did not have the benefit of *Wilson, supra*, 69 Cal.App.5th 665 and *Arias, supra*, 66 Cal.App.5th 987, both of which were issued well after Sison's petition was denied.

findings in 2009, well before the California Supreme Court decided *Banks* and *Clark* and clarified the meaning of the terms "major participant" and "reckless indifference to human life" necessary to support such felony-murder special circumstance findings. (*Banks*, *supra*, 61 Cal.4th at pp. 797–798, 803; *Clark*, *supra*, 63 Cal.4th at pp. 608–624.)

As the trial court acknowledged, there is currently a split in the appellate courts as to whether a defendant is categorically precluded from relief under section 1170.95 based on a felony-murder special circumstance finding that occurred before *Banks* and *Clark*. (See *Wilson*, *supra*, 69 Cal.App.5th at pp. 672–673, 676–677.) Some courts have found that such a special circumstance finding bars relief under section 1170.95, and a defendant must instead pursue a claim that the finding would not be supported by substantial evidence following *Banks* and *Clark* through a petition for habeas corpus. (See *Gomez*, *supra*, 52 Cal.App.5th at pp. 16–17; *People v. Galvan* (2020) 52 Cal.App.5th 1134, 1142–1143, review granted Oct. 14, 2020, S264284.) Others have disagreed and have, instead, concluded that a special circumstance finding does not categorically bar relief under section 1170.95 because the court in *Banks* and *Clark* " 'construed the meanings of "major participant" and "reckless indifference to human life" "in a significantly different, and narrower manner." ' " (*People v. York* (2020) 54 Cal.App.5th 250, 258; *People v. Smith* (2020) 49 Cal.App.5th 85, 93–94, review granted July 22, 2020, S262835; *People v. Torres* (2020) 46 Cal.App.5th 1168, 1180, review granted June 24, 2020, S262011.)

As this court recently stated: "The Courts of Appeal have subjected the issue at hand to vigorous debate and devoted countless pages of discussion on the subject. The issue is currently under review by the Supreme Court as well, so we will soon have clarity one way or the other. [Citation.] Given this

18

context, we need not add to the conversation with further extensive argument or analysis.  [¶]  It will suffice for us to state that we are persuaded by the logic of the courts that have concluded pre-*Banks* and *Clark* felony-murder special-circumstance findings do not categorically preclude defendants from obtaining resentencing relief under section 1170.95." (*Arias*, *supra*, 66 Cal.App.5th at pp. 1003–1004.)  Thus, we adopt the pertinent analysis of those courts, including *Wilson*, *supra*, 69 Cal.App.5th 665 and *Arias*, *supra*, 66 Cal.App.5th 987 and incorporate them here.

As in *Wilson*, the jury here found *Sison* guilty of first degree murder and found the felony-murder special circumstances true before our high court provided additional guidance as to the factors relevant to those charges.  (See *Wilson*, *supra*, 69 Cal.App.5th at pp. 684–685.)  Thus, "[i]t is possible that a jury considering [Sison's] conduct under the gloss of *Banks* and *Clark* could find that the People did not meet their burden in proving the special circumstances true." (*Wilson,* at p. 685.)  We therefore conclude the trial court erred by relying solely on the robbery-murder special-circumstance finding to deny Sison's section 1170.95 petition with respect to count 4.

## II.
## REMAND IS APPROPRIATE

The People assert any error is harmless because the record of conviction establishes the jury's robbery-murder special-circumstance finding was valid as a matter of law even if we consider the additional guidance provided in *Banks* and *Clark*.  We disagree.

"[T]he application of *Banks* and *Clark* to a given set of facts ultimately presents an issue of law," such that the appellate court should undertake an individualized review of the record of conviction to determine whether the special-circumstance finding satisfies the *Banks* and *Clark* standards.

19

(*People v. Secrease* (2021) 63 Cal.App.5th 231, 255 (*Secrease*), review granted June 30, 2021, S268862; accord *Wilson, supra*, 69 Cal.App.5th at p. 686; *Arias, supra*, 66 Cal.App.5th at pp. 1004–1005.) However, when, as here, the record of conviction before the court "consists almost entirely of what we can discern from [the appellate opinion in the direct appeal]" and it is "too sparse to make a definitive assessment of that issue one way or another," remand is proper. (*Secrease*, at p. 261; see *Wilson*, at p. 686 [declining to conduct a review under *Banks* and *Clark* on appeal and clarifying the trial court need not rely solely on the previous appellate opinion]; *Arias*, at pp. 1005–1006 [remanding for trial court to conduct a sufficiency of the evidence review of the full record of conviction because the appellate opinion did not address the vast majority of the actus reus and mens rea factors set forth in *Banks* and *Clark*].)

Similarly, here, the People rely on the previous appellate opinion in the direct appeal, but the opinion does not provide a sufficient set of undisputed facts to allow us to make a definitive assessment of whether the felony-murder special circumstance satisfies the *Banks* and *Clark* standards. Instead, the opinion reveals at least some dispute regarding the facts central to such an analysis. Specifically, the opinion indicates there was evidence, provided by a friend of Martin, (J.D.), that Sison handed Martin a gun before the shooting of the victim. Also, J.D. testified that he saw Sison chasing the victim, along with Martin, after Martin shot at the victim. However, there also was evidence that Martin had asked F.L. if he wanted to buy a gun; thus, it is possible that Sison handed the gun to Martin to allow him to sell the gun. In addition, Sison offered alibi evidence.

Further, there may have been evidence relevant to the inquiry that was not discussed in the previous appellate opinion. As is appropriate in such

cases, the appellate opinion does not resolve disputes in the evidence and, instead, "recite[s] the evidence in the light most favorable to the judgment." (*People v. Avanessian* (1999) 76 Cal.App.4th 635, 637.) However, when determining whether substantial evidence supports the jury's finding on a special circumstance finding, the focus "is on the whole record of evidence presented to the trier of fact." (*People v. Cuevas* (1995) 12 Cal.4th 252, 261.)

We therefore remand the matter to the trial court to consider the issue "in light of the full record of conviction, including the trial evidence." (*Secrease*, *supra*, 63 Cal.App.5th at p. 261; accord *Wilson*, *supra*, 69 Cal.App.5th at p. 686; *Arias*, *supra*, 66 Cal.App.5th at pp. 1005–1006.) On remand, the trial court must determine whether Sison has made a prima facie showing on his petition with respect to count 4, notwithstanding the jury's special circumstance findings. As our high court recently clarified, the trial court may consider the record of conviction, including the appellate opinion in the direct appeal but "should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Lewis*, *supra*, 11 Cal.5th at p. 972.) "[T]he 'prima facie bar was intentionally and correctly set very low.' " (*Ibid*.) "Thus, the trial court should issue an [order to show cause] unless the record of conviction unequivocally negates [Sison's] contentions, rendering him unable to meet his burden." (*Wilson*, *supra*, 69 Cal.App.5th at p. 686.)

DISPOSITION

The order denying Sison's section 1170.95 petition is reversed and the matter is remanded to the trial court for resumption of proceedings to determine whether Sison has made a prima facie showing on the petition for resentencing.

HUFFMAN, Acting P. J.

WE CONCUR:


AARON, J.


GUERRERO, J.

22